Okay, Mr. Sullivan. May it please the court. John Sullivan on behalf of the appellants. Like Zeta, this case is controlled by Beck. It establishes both the lack of a Fourth Amendment violation and the reasonableness of the board's actions in this case. But before addressing the merits, I would like to make just a couple of points on the standing argument. First is that we know that the Fourth Amendment standing cannot be raised vicariously. So that means without ownership or possession of the records, there was no injury to Dr. Barry here. That's the distinction with the Zeta case, right, in terms of standing? There was not a standing argument made in the Zeta case, Your Honor. That's correct, because he was the owner of the clinic, was the owner of the records there. It is normally the case if a business is searched, a regular employee doesn't have Fourth Amendment interests to raise, right? That's correct, Your Honor. And so the district court here relied on two things, one being that Dr. Barry was named in the subpoena. But as we pointed out, the subpoena says to Dr. Barry or the custodian of records, because it was unclear at that point who actually had possession and ownership of those records and who would have the ability to let the board make copies of them. So the records were for patients treated by Dr. Barry, correct? That's correct, Your Honor. There were other physicians there, but they were just looking for the Barry treatment records. There were a couple of physicians and also a physician assistant, I believe, that's common. There were two different subpoenas that were going on. But again, Dr. Barry doesn't own these records, and so that's why he says, I'm just a part-time employee of the clinic, so that if the subpoena had not said or to the custodian of records, it seems that it would have been ineffective in this case. Did he have a privacy interest? Pardon, Your Honor? Did he have a privacy interest in the treatment records? No, Your Honor, not as against the board. The district court's second argument was basically that these were, you know, Dr. Barry's claim that these were obtained illegally, and now they're being used against him. But that's the case in every instance where someone tries to make a Fourth Amendment challenge. The subpoena listing his name, even if it just listed his name, if that were the case, would you think he has an interest, or do you still think it just turns on ownership? Your Honor, we would say that it still turns on ownership. We believe that it would have been an ineffective subpoena at that point, that he would have said, I don't own those records, I can't give them to you. But, I mean, normally, let's say there's a search warrant for Google, and it lists some corporate official in Google as the person to execute it. It does seem that still wouldn't mean that person listed on the subpoena has an interest to assert Google's rights, I mean, on their own behalf. Yes, Your Honor, we would agree with that. And so the closest case that we could find to analogize here was the United States v. Miller, where it dealt with the person making the bank records. But when that person made those bank records, the court noted that they were being, at the same time, exposed to third parties. The same type of situation happens here. When those medical records are made, they're not owned by Dr. Berry, they're owned by the clinic. The clinic can then turn around and sell them to another clinic or to other doctors as part of a transfer of patients. And so the interests here are, again, the ownership, at least possession, but especially ownership of these records would seem to be, at the minimum, a necessary requirement. Under Texas law, does the patient have any ownership interest in the records? No, Your Honor. If a patient requests their records, a copy of those records would be made and sent to another. For instance, if you're transferring doctors, a copy of your records will be made, but the original doctor or the original clinic holds on to those records unless they are transferred officially under law. And, again, that's, of course, why the HIPAA regulations explicitly exempt the board from normal privacy concerns that a doctor-patient relationship would have as against the world. It's a different relationship when it comes to this. And whether there's a Fourth Amendment interest is a different question from whether there could be a privilege challenge to the use of the documents in a legal proceeding, right? Yes, Your Honor. Someone can seize documents, you can still say that I have privilege, so you can't use those on privilege grounds. Yes, Your Honor, that would be a separate issue, and we went through that also in the briefing. Texas law, how it treats, there is a physician privilege. But, again, that is different with respect to the board as opposed to the outside world. And, again, of course, this isn't a criminal investigation. It's a civil investigation against the doctor. And so the patient records are not, there's not an issue of the patient being investigated. So why don't you move on to the merits? We have plenty of time. Copying records that don't belong to the doctor and the patients have no right under federal or state law to keep private from the board cannot be a Fourth Amendment violation against the doctor. There are two points here to consider on the merits. First is that the medical profession is a closely controlled industry. And second is that the burger factors are met. Well, I thought Zoddick said it's not a closely controlled industry. Yes, Your Honor, and so that opinion was just released a week ago. And so it has attempted to cabin what is closely controlled. Well, but, I mean, as you well know, it is binding circuit law from the day it was issued, which I think was last Friday. So it's there for you to deal with. Yes, Your Honor. What was that finding made? Was that analysis announced by the opinion? Yes, Your Honor. Or was it assumed without? It treated the medical, it said that the medical profession as a whole should not be considered closely controlled, but that with respect to controlled substances, that that aspect of the medical industry would be. But this is not a controlled substance. Yes, Your Honor. This case deals with controlled substances. This is about a complaint that alleged Dr. Berry was running a pill mill, in effect. And so this is part of the statutory mechanism that the board uses in order to combat the opioid epidemic that's taking place. And so. But then the opinion from last week says even assuming it's closely regulated, it doesn't meet the other burger. It doesn't meet the second burger requirement. That's correct, Your Honor. So how do you get around that? So, again, that would be binding, except that we would say that it actually goes against this court's holding in United States v. Fort, when the Zeta opinion makes two mistakes with respect to the burger factors. One is that it virtually adopts the dissent from United States v. Fort and makes it the holding. And then it also then misapplies that standing. So the issue there is what is controlling the discretion of the government actor with respect to who is being chosen for the inspection? It just seems if there's mistakes in it, it seems to me you need to raise that with that panel. The administration has said we can't say that decision from last week is wrong. Well, Your Honor, unless under this court's rules, the prior panel decision in the United States v. Fort would hold sway over the opinion from last week. Well, if Zodiac didn't say that Fort was wrongly decided, but it engaged in an interpretation of Fort, then Zodiac is a binding decision on us insofar as its interpretation of Fort is concerned. So, Your Honor, it used Fort in its analysis of the qualified immunity piece saying that because Fort is sitting out there, then the defendants here had a reasonable belief that what they were doing would be acceptable under circuit law. It did not address Fort under the burger analysis. And so, again, as we've pointed out here, the discretion of the inspecting officers is limited both by the statutory and regulatory scheme, and it's limited by the complaints that are filed with the board. So the board doesn't choose which doctors it's going to be inspecting on its own. It receives a complaint from either another doctor or a patient, a family member sometimes, or another agency. That complaint is filed with the board. The board then looks at it first to determine if it's the type of complaint that the board would have jurisdiction over, and then, secondly, the board will go to something called, in this case, the Prescription Monitoring Program, which is the list of drugs that are kept that have been prescribed to patients, and the board will examine that to see if there is a factual predicate for the complaint. Is there a legitimate potential complaint at issue? Then following that, they will make a determination on which subpoenas would need to be issued in stanter. So the adequate substitute for the warrant then under both Burger and Beck is covered because it does those two things. It limits the discretion of the inspecting officers, and it also, the statutory scheme advises the owner that the search is being made pursuant to law and has a properly defined scope. There is the formal complaint as well as the subpoena being limited in scope itself. The subpoena, at page 247 and then the attachment there to 249, both lays out the statutory authority for the subpoena that's being served and then also identified the exact items that were going to be at issue in this case. So there were a couple of things stated in the response yesterday to the 28J letter that I wanted to address. First is that the search, one was that the searches were made of all the records. That's not the case as the record shows at 153 and then confirmed later by the district court at 264. This was not all records. This was the inspectors gave the subpoena to the custodian of records. Patient records were then brought to the investigators. So it was for a defined window. It was that April 1st to April 30th of that year, and they only inspected the things that were brought to them. And they were only Dr. Barry's treatments, right? Your Honor, there were two subpoenas served at the same time, but at issue here are only Dr. Barry's. All right. Thank you. You've saved time for your panel. Thank you. Mr. DeMond. Thank you. Good morning, Your Honor. May it please this honorable court, my name is William Pratt DeMond and I represent Plaintiff Appellee Dr. Jean Barry. In this case, the district court below correctly concluded that the plaintiff had a clearly established right to seek pre-compliance review. Second, it found that that pre-compliance, that that clearly established right was longstanding such that the regional people would know about it. It found the statutory scheme at issue did not satisfy either of the two warrants functions, and it found there were privacy interests involved. Those same privacy interests were found by both the state and federal court that adjudicated Morgan as well as by the panel and Zeta. In fact, this panel and Zeta found those patient privacy interests were heightened at page nine of the panel's decision. Why don't you start with standing? Yes, Your Honor. With respect to standing, there were two subpoenas that were issued, one to Dr. Barry specifically and one to Red Bluff, the custodian of records. The decision in Katropia that came down held that only licensees are subject to subpoenas from the Texas Medical Board. So either these documents were seized pursuant to a void subpoena to the custodian of records because it was not a licensee or pursuant to the one to Dr. Barry. Either way, they were seized illegally because there was no statutory scheme which satisfied Burk. What's your best case for saying that your client has a Fourth Amendment interest when he's not the owner of the business that's searched? Because he's not the owner, Your Honor? He's not the owner, right? He's not the owner of the client, no, Your Honor. It wasn't an issue in the Zeta because he was the owner. That's correct. What's the best case for saying that, well, just for your client's Fourth Amendment, having a Fourth Amendment interest here? What's your best authority? Well, the district court found, Your Honor, that because the documents were being used against him that that implicated his Fourth Amendment's rights. I get that. As far as standing. Aside from the district court opinion? Aside from the district court opinion, Your Honor, I don't think that it's much different than any other privileged holder, than any other person whose documents are taken to say that these documents can be used and seized without a warrant. But they're not his documents, is the point. I mean, if a law firm is searched, say some big Houston law firm is searched, an associate who has no ownership interest in that law firm I don't think would have standing even if all her legal files were seized during that search. I don't think she'd have standing Fourth Amendment interest. Now, she can still later, you know, the client obviously has a privilege and all that, but maybe we just see it differently. I believe that that case would be sorrel. I believe IMS is the United States Supreme Court case which found that doctors do, in fact, have expectations of privacy in their medical records. I will find that decision promptly, Your Honor. But I believe that the district court directly quoted to Judge Pittman's order from the Zeta case and found that there were, in fact, privacy interests implicated. Excuse me. That may have errored the Morgan decision. Does your standing argument hinge on the fact that he was listed in the subpoena? Not only that he was listed in the subpoena, Your Honor, but that the other subpoena was listed to the custodian of records which the Texas Medical Board did not have the ability to subpoena under the decision in control. Let's say they listed the owner on the subpoena. Would you still argue you have standing? If it listed the owner of the clinic. But said produce your client's files because we have these concerns. Again, my initial argument, Your Honor, would be that that would be void because the owner of the clinic is not a licensee. I don't think that affects the Fourth Amendment. Just assume with me that it's issued to the owner of the clinic. Would you still say, because it seems to me you're saying it's the files themselves, but you don't know what your position would be? Your Honor, I believe that there is, in fact, a United States Supreme Court case. It is not Sorrell, so I was mistaken on that one. I believe in that case it would be Charleston, the Charleston Hospital case. It said that doctors did, in fact, have some expectation of privacy. Ferguson v. City of Charleston, I believe, is going to be a case, Your Honor, that says that doctors do, in fact, have some expectation of privacy in the medical records. That would be 532 U.S. 67. I don't have the PIN site readily available, but I'll endeavor to find it for you. Don't the regulations of the Texas Medical Board allow clinics to be investigated and records to be seized and reviewed without a subpoena? Some, under some circumstances, Your Honor, but certainly not suspected pain management clinics that are unregistered, such as this one. There is no statutory scheme at all. In addition, those regulations apply to registered pain management clinics. Dr. Berry did not run a registered pain management clinic, so therefore those regulations did not apply. But furthermore, perhaps more importantly, Berger says there must be a statutory scheme in place. This is not a statutory scheme. These are regulations that are enacted by the Texas Medical Board. These are administrative agencies that are not elected by the people. Therefore, this is not a statutory scheme at all, and therefore it cannot satisfy Berger on its face. But wouldn't it be binding on licensed physicians? Isn't that the point? The ability to conduct warrantless searches on registered pain management clinics? Yes, Your Honor, but this was not a registered pain management clinic. Therefore, the regulations did not apply. Well, what's the difference? How could it function as a pain management clinic if it wasn't registered? That gets into nuanced issues of regulatory law, Your Honor. However, my understanding is that certain entities must be registered if I believe it's something like 51% of their patients receive a certain combination of drugs that are not being administered a different healing modality within that doctor's specialty. Some things of that effect, Your Honor. So there are registered and unregistered pain management clinics in Texas, but the statutes do not permit the Texas Medical Board to do anything to determine whether or not unregistered pain management clinics should in fact be registered. To the extent they do, they certainly don't satisfy the time, place, and scope regulations that are clear both from Berger and Biswa. In addition, there is no limitation at all on time at which the subpoenas can be executed, just as there are in the other close to the regular industry cases from the United States Supreme Court. Those are present in Kalanad, Biswa, as well as Berger. All three of them had direct limitations on time during business hours, during daylight hours. There is no such limitation here. Therefore, the statute cannot meet Berger as a matter of law. I guess it was during the day, right? It was, Your Honor, but that is not the point. The point is does the statute contain the limitation, and it does not. Because it does not contain the limitation, it does not satisfy either of the two warrant functions, and it does not satisfy Biswa or Berger, as the other cases did. All those other cases from the Supreme Court involved statutes that had expressed limitations on time. The privacy-interested issue in this case preclude the finding that close to the regular industry is a matter of law under Patel. Patel found that if there is, in fact, a privacy interest, therefore, there cannot be a close to the regular industry. It's clear that there are, in fact, privacy interests implicated in patient medical records. I believe that every court that has addressed the issue has found there's at least some expectation. And again, the Zeta Court found that it's a heightened expectation. Beck does not apply to this case for a multitude of reasons. First and foremost, the court in Beck never found the dental industry was a close to the regular industry, nor could it. Because the statute issue in Beck involved controlled substances, the Controlled Substances Act. That act applies to a variety of industries, including doctors, optometrists, podiatrists, dentists, board of nursing, physicians' assistants, and medical examiners. So that statute could not create a close to the regular industry because it didn't apply to a specific industry. Nevertheless, the court never used the term close to the regular industry in Beck and did not find that it was one. Additionally, there's no evidence that anybody believed that there were controlled substances on site. There's no evidence there were controlled substances on site. Because there were no controlled substances on site and because there's no evidence of controlled substances on site, the Controlled Substances Act does not apply under Katropia. The court in Katropia found that there was no proffer of the Controlled Substances Act or a comparable act that provided authorization to enter and conduct a warrantless search. Additionally, there's no evidence in any record that any Texas medical court official was aware of Beck at any time or relied on it. In fact, the evidence shows that when Dr. Berry's attorney asked for their authority, they presented their subpoena authority, Texas Occupations Code 153.007. Additionally, the subpoena, to which opposing counsel previously referred, does not list Beck in any way. It simply lists the subpoena authority. When read in the light most favorable of the plaintiff, this demonstrates that they did not have any evidence or have any reliance on Beck at all. Even if they did know, the court in Zeta found at page 14 that it was not for these actors to engage in this nuanced question of constitutional law. In fact, the Second Circuit, when it addressed these issues, found similar and found that because there was no implicit overruling of precedent, that the individuals involved in that case could not rely on that and were not entitled to qualified immunity. That's Anderson v. Recorp, 317F3194200-201. But last week our court said Beck does provide qualified immunity. It was close enough to provide, to this question, to provide qualified immunity. So how do you get around that? Well, that raises several questions, Your Honor. First and foremost is the direct odds with Katropia, which found that Beck did not apply. And second— So you both think for different reasons the decision was wrong, but how do we not apply it, whether it's right or wrong? Well, I think the question presented, Your Honor, is whether or not this court is prepared to follow C v. City of Seattle. Katropia did. Zeta did not. In C v. City of Seattle, the United States Supreme Court found that these inspections could not be enforced by agents in the field. Zeta did not refer to that or rely on that or even mention it. The court in Katropia directly—the Fifth Circuit panel in Katropia directly relied on C and honored it to the letter and said that these agents cannot, in fact, do this. So I think that the question is whether or not the court is going to follow C, not whether or not the court is going to follow Zeta. Additionally, neither—Beck did not have an attorney on site telling the Texas Medical Board that they needed to leave or the Texas Dental Board that they needed to leave. Beck did not involve lawless threats of searching all documents on site or arresting people if they chose to interfere. Beck did not involve a constitutional violation. The two judges that decided Beck—Judge Shaw died before the decision was issued. The two judges that decided Beck held there was no constitutional violation. Both Katropia and Zeta found that there was, in fact, a constitutional violation. Therefore, Beck is readily distinguished on its face. Additionally, here, as opposing counsel mentioned, they already had a lot of information via the Prescription Monitoring Program. They had the names of the individuals. They had the prescriptions that were prescribed to them and the amount. It's also in the Zeta response brief at page 30, note 10. That precludes them from being able to issue a subpoena under Texas law. We have in Shade v. Texas Workers' Compensation Commission, that's at 150 Southwest 3rd, 542551. Specifically, if they have the information in their possession, they cannot issue a subpoena to get it, an administrative subpoena to get it. Additionally, neither 153.007—excuse me, neither Texas Occupations Code 153.007 nor 168.052 support warrantless searches of suspected pain management clinics for any reason. And Beck, as applied, would appear to permit any state agency to issue warrantless subpoenas because the Fifth Circuit has not told them they can't do so. Close to the regular industry exception is an exception. It has been clearly regulated and clearly administered and clearly adjudicated by the courts that have heard it. And this court's decision in Zeta would say that just because we haven't found that you can't do it, therefore you can and get away with it because Beck says so. That requires rectification and clarification. Let's just go back to the basics here. So your client is a doctor who did not have an ownership interest in the clinic or an ownership interest in the records, but he's suing for a Fourth Amendment violation under Section 1983. Is that all correct? That's correct, Your Honor, based on his expectation of privacy in those records. Expectation of privacy in records that he doesn't own is a violation of the Fourth Amendment? I just want to understand your claim. I don't quite see where your whole theory is going as to this particular person. Your Honor, I believe, again, that the Supreme Court has said that doctors do, in fact, have that expectation. And I believe that just as a counsel, just as an attorney, if somebody were to come to a firm, you gave the example of a firm, I may not necessarily own those records if I work for somebody else. But that doesn't mean that I do not have an expectation of privacy in those records and that I do not have some degree of ownership in them because they do, in fact, have my thoughts, my issues. I'm entitled to take them with me when I go in some cases, particularly if I take the clients with me. They belong to the client. They belong to the patient. And just as with an attorney, if they ask me for those records, I need to give them to them. They belong to them. They belong to the patients. The Supreme Court has already found that the patients don't have standing to bring those. But you don't have any case in which the employee of a business, a non-owner employee, has standing to challenge a search of the business's records? Your Honor, to be quite frank, I did not imagine that was going to be the issue before this court today, and I did not. They've raised standing. I am aware that I did not think that that was going to be what got this court's attention. Who was the employee that gave permission? Excuse me? Who was the employee? What was the title of the employee that gave permission, that brought the files out? Well, I don't know that anybody gave permission, Your Honor. There was another attorney involved who previously said that it could be done. But Texas law is very clear that that consent can be withdrawn. That consent was withdrawn when Dr. Berry's attorney said you need to leave the premises. But then I thought someone else. Was it an office manager? Yeah, it was an administrator. I believe it was somebody who brought out the documents. What their title was, I don't know offhand, Your Honor. Did I hear you? Because I asked Mr. Sullivan whether in Texas the patient has ownership interest in the records, and he said no. But I thought you just told us that the patient does have an ownership interest. I'm not relying on any statute or case law for that, Your Honor. However, I do deem it to be comparable to the legal profession in that respect. I use the legal profession as an analogy. I have no precedent for that in that respect. But it's my understanding in the law that the files frequently belong to the clients. And the clients, if they insist on having to put the file, they're entitled to it. I believe that under Texas law, doctors would be treated comparably. Wouldn't the files belong to the law firm, not the client? I believe, Your Honor, they belong. I defer to Your Honor's expertise in this field, but I believe that I've always been told they, in fact, belong to the client. And the client can do what the files they wish. And if they demand the file back, they're entitled to it. The firm can't keep it from the client because the firm says you can't have it. That would be a violation of the ethics rules as I understand them. But I also don't have precedent for that specific point either. Getting back to the last point in Beck, if this court were to apply Beck, Mary Chapman is a defendant both in this case and in Katropia. In Katropia, the court found that Beck did not apply and found that she was not entitled to qualified immunity. If the court were to apply Beck in this case, the same individual would be found to have qualified immunity in one case and not qualified immunity in another for the same basic acts under the same code in a similar 1983 action. And I respectfully affirm that would yield an absurd result and undermine the credibility of both the 1983 and certainly the law in the Fifth Circuit. Do you concede that Zeta's binding on this panel with respect to the finding of qualified immunity? I hesitate to concede that point, Your Honor, but I believe that I must under my understanding of the rule of orderliness. However, I believe that what supersedes Zeta even is C v. City of Seattle, the United States Supreme Court case, which says outright and unequivocally that these searches, these inspections, these demands for inspection in the field cannot be made by the agents themselves. It absolutely unequivocally precludes that, and there's no case law that we have found that in any way questions that case law. So that, regardless of Zeta, I believe that the Supreme Court trumps the Fifth Circuit's opinion, respectfully. Berger case requires there be a constitutionally adequate substitute for a search warrant. The courts that have addressed this issue have found that there isn't one. This discretion to perform searches whenever the Texas Medical Board believes it is appropriate and necessary violates United States Supreme Court jurisprudence, which says nothing is to be left to the discretion of the officers. That includes Stanford v. Texas, Johnson v. United States, and Mallaby v. Briggs. This is clear. This discretion does not provide the predictive regularity necessary to satisfy the third claim of Berger. This is the third case this year on this issue brought before the Fifth Circuit. The first two are in direct conflict with one another concerning the applicability of Beck, and there are no dissents in either case. The fourth case, Morgan, has now been fully briefed to the Fifth Circuit. The court's application of Beck and refusal to follow C v. Seattle should be distressing to anyone who cares about the Fourth Amendment or Starr decisis. In this case, it is difficult to imagine a situation in which clearly established rights from the United States Supreme Court concerning pre-compliance review, at least, can somehow be muddied by decisions from the Fifth Circuit interpreting a case that interprets an entirely different statutory regime. Beck did not involve the statutes issued in this case. Therefore, the idea that defendants could somehow believe that Beck permitted their warrantless searches despite the clearly established right to pre-compliance review simply doesn't make any sense. It needs to be addressed. Therefore, because the Fourth Amendment is clear, because the close to the regular industry exception is clearly an exception, and because the Supreme Court jurisprudence interpreting that is clear, this report's holding below should be affirmed. Thank you, Mr. DuMont. Thank you, Your Honor. Mr. Sullivan, you've saved time for a vote. What do you say about the City of Seattle case? Your Honor, as we've pointed out in the brief, to argue that City of Seattle applies here begs the question at issue, and that's whether or not this was a closely controlled industry with the requisite burger factors in place or, at a minimum, that the inspectors should have been able to rely on this court's decision in cases such as Beck or United States v. Ford or all the other ones that we've set forth in order to believe that they had a right to request the records that they're requesting. Okay, so this is a little bit repetitious of your previous discussion, but if we take the Zeta case on its face, in other words, if we assume for the purposes of this question to you that Zeta doesn't violate the rule of orderliness, taking that on its face, is this a closely controlled industry insofar as that term is significant here? It could be under the Zeta opinion didn't fully go into that because it said that we look at closely controlled substances and kind of carve that out as a subset, and they said it may be the case that this would be considered a closely controlled industry, but we're not going to fully explore that here because we believe that it violates a burger factor. Okay, now Mr. DuMont says that it doesn't fit under controlled substances because there were no controlled substances found here. Your Honor, that's a distinction without a difference here. Beck dealt with both the Texas Controlled Substances Act as well as a comparable, there were parallel statutes at issue in Beck, and the court in Beck was addressing whether the burger factors had been met or not. They had already virtually, it wasn't explicit holding, they had assumed that the dental industry was a closely controlled industry, and they were on to the burger factors. They were already at that point. But dentists do have narcotics in their office. Here, the pain management clinic, you have to get a prescription and then go fill it at a pharmacy, which has the narcotics. Yes, Your Honor, but again, the question here is what are the doctors doing, so whether or not, I mean most doctors' offices I would think have pills around, but even if we assume that there were none here, handing that prescription, which the patient can take next door to the pharmacy and have filled, is just as dangerous and just as lethal as if you had the drugs in your office. Does it matter that the clinic wasn't registered as a pain management clinic? No, Your Honor. The statutory scheme, so the regulations there are, there's two different schemes. If you are a pain management clinic, then Texas allows for on-site physical inspections, and that goes under, if you look at Texas Occupation Code 168.053, it talks about a physician who owns or operates a clinic in the same manner as complainants. So if you're acting, if you're virtually functioning as a pain management clinic, even if you haven't registered as one, then under that part of the statutory scheme, the board could conduct a physical inspection. Without a subpoena? With a subpoena in Santa, without a warrant. So in this case, though, Your Honor, there wasn't a physical search that took place. The inspectors sat and were brought the records. So this wasn't about the physical search. That, again, the part of the statutory scheme that we're worried about pain management clinics, that's when you're going to actually walk around, you're going to tour, and you're going to see. Why did they turn the security cameras off? Your Honor, I don't have an answer for that. That's not on the record. Okay. Very quickly, just on standing, there is no case. My friend can't supply you with one today. The district court couldn't supply one either. If you look at the record at 267, the district court just said, well, of course he has standing because the records are being used against him. But as we discussed, that was also the case in United States v. Miller. That was the case in Rockets v. Illinois. That was the case in Rawlings v. Kentucky. All of these cases are of that same milk. And the expectation of privacy can't do the work that I believe is wished that it could here because Miller, in that case, would have also had an expectation of privacy in his bank records. Thank you, Mr. Sullivan. Your case and all of these cases are under submission.